# United States Court of Appeals
# for the District of Columbia Circuit

## No. 26-1070

(Consolidated with 26-1072)

AIR ALLIANCE HOUSTON; ALLIANCE OF NURSES FOR HEALTHY ENVIRONMENTS; AMERICAN ACADEMY OF PEDIATRICS; AMERICAN LUNG ASSOCIATION; AMERICAN PUBLIC HEALTH ASSOCIATION; CHESAPEAKE CLIMATE ACTION NETWORK; CITIZENS FOR PENNSYLVANIA'S FUTURE; CLEAN AIR COUNCIL; CLEAN WISCONSIN; CONSERVATION LAW FOUNDATION; DAKOTA RESOURCE COUNCIL; DOWNWINDERS AT RISK; ENVIRONMENTAL DEFENSE FUND; ENVIRONMENTAL LAW AND POLICY CENTER; KENTUCKY RESOURCES COUNCIL; MONTANA ENVIRONMENTAL INFORMATION CENTER; NATURAL RESOURCES COUNCIL OF MAINE;

*(For Continuation of Caption See Inside Cover)*

*On Appeal from the Environmental Protection Agency in No. EPA-91FR9088.*

# BRIEF OF GOVERNMENT ACCOUNTABILITY & OVERSIGHT AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENTS

MATTHEW D. HARDIN
D.C. Bar No. 1032711
101 Rainbow Drive #11506
Livingston, Texas 77399
(202) 802-1948
matt@matthewhardin.com

CHRISTOPHER C. HORNER
D.C. Bar No. 440107
1725 I Street NW
Suite 300, PMB #2094
Washington, DC 20006
(202) 262-4458
chris@chornerlaw.com

*Counsel for Amici Curiae*

May 14, 2026



NATURAL RESOURCES DEFENSE COUNCIL; PHYSICIANS FOR SOCIAL RESPONSIBILITY; SIERRA CLUB,

*Petitioners,*

*v.*

ENVIRONMENTAL PROTECTION AGENCY; LEE M. ZELDIN, Administrator, U.S. Environmental Protection Agency,

*Respondents.*

———————————————

STATE OF NORTH DAKOTA; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARKANSAS; STATE OF GEORGIA; STATE OF IDAHO; STATE OF INDIANA; STATE OF IOWA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF TEXAS; STATE OF UTAH; STATE OF WEST VIRGINIA; STATE OF WYOMING; TALEN MONTANA, LLC; TALEN ENERGY SUPPLY, LLC; MIDWEST OZONE GROUP; NORTHWESTERN ENERGY GROUP, INC., d/b/a NorthWestern Energy; NACCO NATURAL RESOURCES CORPORATION; WESTMORELAND MINING HOLDINGS LLC; WESTMORELAND MINING LLC; WESTMORELAND ROSEBUD MINING LLC; NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION; AMERICA'S POWER; ASSOCIATED ELECTRIC COOPERATIVE, INC.; BASIN ELECTRIC POWER COOPERATIVE; BIG RIVERS ELECTRIC CORPORATION; EAST KENTUCKY POWER COOPERATIVE, INC.; MINNKOTA POWER COOPERATIVE, INC.; SUNFLOWER ELECTRIC POWER CORPORATION; NATIONAL MINING ASSOCIATION; OAK GROVE MANAGEMENT COMPANY, LLC; LUMINANT GENERATION COMPANY LLC,

*Movant-Intervenors for Respondent.*

**Certificate of Parties, Rulings, and Related Cases**

Pursuant to D.C. Circuit Rule 27(a)(4) and 28(a)(1)(A), I certify that the parties to this case are set forth below.

Petitioners: In Case, No. 26-1070, the Petitioners are Air Alliance Houston, Alliance of Nurses for Healthy Environments, American Academy of Pediatrics, American Lung Association, American Public Health Association, Chesapeake Climate Action Network, Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Conservation Law Foundation, Dakota Resource Council, Downwinders at Risk, Environmental Defense Fund, Environmental Law and Policy Center, Kentucky Resources Council, Montana Environmental Information Center, Natural Resources Council of Maine, Natural Resources Defense Council, Physicians for Social Responsibility and the Sierra Club.

In Case No. 26-1072, Petitioners are City of Chicago, Illinois, City of New York, New York, Commonwealth of Massachusetts, DC, Harris County, Texas, State of Arizona, State of Connecticut, State of Delaware, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Vermont, State of Washington and State of Wisconsin.

<u>Respondents</u>: The Respondents are: United States Environmental Protection Agency ("EPA") and Lee M. Zeldin, in his official capacity as Administrator of the EPA.

<u>Intervenors</u>: In each case, Intervenors are NACCO Natural Resources Corporation; Westmoreland Mining Holdings LLC, Westmoreland Mining LLC, and Westmoreland Rosebud Mining LLC; National Rural Electric Cooperative Association, America's Power, Associated Electric Cooperative, Basin Electric Power Cooperative, Big Rivers Electric Corp., East Kentucky Power Cooperative, Minnkota Power Cooperative, and Sunflower Electric Power Corp.; The Lignite Energy Council and The National Mining Association; Oak Grove Management Company LLC and Luminant Generation Company LLC

<u>Amici Curiae</u>: No parties have sought amici curiae status at the time of this filing.

There is one related case:

**1.** *State of Illinois et al v. EPA, et al*. (Case No. 26-1072). That case was consolidated with the instant matter on April 1, 2026.

<u>Rulings</u>: This case is an original action in this Court and does not challenge any Ruling of the District Court.

**Corporate Disclosure Statement**

Pursuant to Circuit Rule 26.1, Government Accountability & Oversight hereby certifies that it is a nonprofit, nonstock corporation incorporated under the laws of Wyoming. As such, Government Accountability & Oversight has no parent company or subsidiaries and no entity owns any part of its stock. Nor does Government Accountability & Oversight own any shares of the stock of any other entity.

Dated: May 14, 2026

/s/ Matthew D. Hardin
Matthew D. Hardin

# Table of Contents

**Page**

Certificate of Parties, Rulings, and Related Cases .....................................................i

Corporate Disclosure Statement ........................................................................ iii

Table of Authorities .........................................................................................v

Statement of Identity, Interest in the Case,
   and Statement of Authority to File ................................................................1

Statement of Authorship and Financial Contributions ............................................2

I.    INTRODUCTION .....................................................................................2

II.   ARGUMENT...........................................................................................6

      A. The Underlying Rule is Pretextual and Violates the Rule Against
         Pretext............................................................................................6

         1) Respondent's Then-Administrator Regan Confessed the Rescinded
            Rule, When Issued, Would be Pretextual..............................................6

         2) The Underlying, Rescinded Rule is Pretextual .....................................12

         3) The Underlying, Rescinded Rule Violates the Rule Against
            Pretext.......................................................................................13

      B. The Rescinded Rule Violates the Major Questions Doctrine ...................19

III.  The Rule Rescinding the Unlawful Underlying Rule Should Stand.............22

IV.   CONCLUSION........................................................................................23

**Table of Authorities**

**Page(s)**

**Cases:**

*Bailey v. Drexel Furniture Co.*,
   259 U.S. 20 (1922).................................................................................14

*Citizens to Preserve Overton Park v. Volpe*,
   401 U.S. 402 (1971)........................................................................ 15, 18

*Ctr. for Biological Diversity v. Kempthorne*,
   No. CV 07-0038-PHX-MHM, 2008 WL 659822 (D. Ariz. Mar. 6, 2008).........13

*Cummings v. Missouri*,
   71 U.S. 277 (1867)........................................................................ 16, 21

*Department of Commerce v. New York*,
   588 U.S. 752 (2019)............................................. 12, 13, 14, 15, 19, 22

*Guedes v. BATFE*,
   920 F.3d 1 (D.C. Cir. 2019)..................................................................22

*Killgore v. SpecPro Prof'l Servs., LLC*,
   51 F.4th 973 (9th Cir. 2022)..................................................................21

*La. Envtl. Action Network v. EPA*,
   955 F.3d 1088 (2020)...........................................................................3

*Michigan v. EPA*,
   576 U.S. 743 (2015)..............................................................................3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..............................................................................22

*New York v. U.S. Dep't of Com.*,
   351 F. Supp. 3d 502 (S.D.N.Y. 2019) ...................................................13

*Rhode Island State Council of Churches v. Rollins*,
   808 F. Supp. 3d 370 (D.R.I. 2025) .......................................................16

*Salguero Sosa v. Garland*,
   77 F.4th 1246 (9th Cir. 2023) ..............................................................21

*United States v. Butler*,
  297 U.S. 1 (1936) ....................................................................................15

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ............................ 5, 7, 9, 10, 15, 16, 17, 19, 20, 22

**Statutes & Other Authorities:**

Brad Plumer & Nadja Popovich, *A New Surge in Power Use Is Threatening U.S. Climate Goals*, *N.Y. Times* (Mar. 15, 2024) ......................................................11

Brett W. Hastings, *Taxation Without Limitation: The Prohibited Pretext Doctrine v. the Sebelius Theory*, 15 Marquette Elder's Advisor 229 (2014) .................................................. 12, 14

D. K. Singh, "What Cannot Be Done Directly Cannot Be Done Indirectly': Its Meaning and Logical Status in Constitutionalism," 29 Mod. L. Rev. 273 (1966) ..............................................................14

D.C. Cir. R. 29(b) ...........................................................................................2

Env't L. Inst., *West Virginia v. EPA: Analyzing Supreme Court's Decision* ..........17

*EPA Administrator Michael Regan Discusses Supreme Court Ruling on Climate Change*, PBS NewsHour (June 30, 2022) .........................................................5

Ethan Howland, "DOE 'emergency' power plant orders help grid reliability: NERC official," Utility Dive (Feb. 20, 2026) .......................................................11

Exec. Order No. 13,990, 86 Fed. Reg. 7,037 (Jan. 25, 2021) ..................................3

Exec. Order No. 14,148, 90 Fed. Reg. 8,237 (Jan. 28, 2025) ..................................3

Fed. R. App. P. 29(a) ........................................................................................1

Jack Thorlin, *Can Agencies Lie? A Realist's Guide to Pretext Review*, 80 *Md. L. Rev.* 1021 (2021) ........................................................ 13, 18

Jean Chemnick & Mike Lee, *What the EPA's New Plans for Regulating Power Plants Mean for Carbon*, *Sci. Am.* (Mar. 11, 2022) ...........................................4, 8

*Joseph Goffman Joins Environmental Law Program as New Executive Director*, Harv. L. Today (Oct. 2, 2017) .........................................................16

Michael Regan, Adm'r, U.S. Envtl. Prot. Agency, *Remarks to CERAWeek About EPA's Approach to Deliver Certainty for Power Sector and Ensure Significant Public Health Benefits* (Mar. 11, 2022)........................................................................7

N. Am. Elec. Reliability Corp.,
*2025 Long-Term Reliability Assessment* (Jan. 23, 2026) .....................................10

National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38,508 (May 7, 2024).....................................5

National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units: Final Repeal, published at 91 Fed. Reg. 9088 (Feb. 24, 2026) .....................................................................2

*President Biden's Historic Climate Agenda*,
White House (archived Dec. 27, 2024)................................................................4

*Regan PBS News Hour Interview* .......................................................................9, 10

Pursuant to Federal Rule of Appellate Procedure 29(a), Government Accountability & Oversight (Proposed Amicus, or "GAO") submits this *amicus curiae* brief in support of Respondents in the above-captioned case.

**Statement of Identity, Interest in the Case, and Statement of Authority to File**

GAO is a nonprofit organization incorporated in Wyoming which conducts research into government policy by seeking access to public records under the federal Freedom of Information Act and similar state transparency laws and uses the information it obtains to educate the public. GAO has no direct interest, financial or otherwise, in the outcome of the case, aside from its interest in good governance and transparent governance conducted with the support of an educated populace.

GAO lacks a direct role but has intimate and firsthand knowledge of public records illustrating that Respondent EPA is rescinding what was an unlawful and pretextual use of regulation by the former administration. The earlier rule – now rescinded by the Rule at issue here – pursued an entirely different goal than that for which Congress provided the statutory authority EPA invoked. That revision represented an end-run around the Clean Air Act, Administrative Procedure Act ("APA") and other legal and political constraints on agency authority. EPA's reversal and rescission are therefore not merely proper but necessary. GAO can provide the Court with a perspective that is distinct and independent from that of the

parties. Further, GAO's information relates this matter to the Supreme Court's rulings not only on the rule against pretext but the major questions doctrine. It appears no other party has yet raised the issues set forth in this brief, and the brief will therefore assist the Court in determining these issues.

GAO has sought leave to file this brief pursuant to a contemporaneously filed Motion for Leave to File as an *Amicus Curiae*. D.C. Cir. R. 29(b).

## Statement of Authorship and Financial Contributions

No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *Amicus Curiae*, its members, or its counsel made a monetary contribution to its preparation or submission.

## I.      INTRODUCTION

A coalition of states and environmental activist groups have sued in this Court to challenge a final regulation of the Environmental Protection Agency ("USEPA" or "the Agency"), "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units: Final Repeal," published at 91 Fed. Reg. 9088 (Feb. 24, 2026) ("the Rule"). The Rule at issue rescinds an unlawful 2024 rule which established more stringent standards of certain covered emissions from certain power plants. EPA rescinds on the grounds that the previous

rule revising the hazardous air pollutant ("HAP") standards came as part of a Technology Review in response to a "climate crisis" Executive Order,[1] at massive cost.[2] Yet the 2012 standards in place at the time already offered (and still offer) requisite protections. Petitioners seek a determination that the 2026 Rule (the rescission) is unlawful, arbitrary and capricious, and must be vacated.

Information in this brief established that the underlying rule which EPA has now rescinded was otherwise unlawful for reasons additional to those cited in EPA's

---

[1] 89 Fed. Reg. 38,508 (May 7, 2024), acknowledging the impetus was Exec. Order No. 13,990, 86 Fed. Reg. 7,037 (Jan. 25, 2021), which focused on forcing changes in the country's electricity generation mix. EO 13990 has since been revoked by Exec. Order No. 14,148, 90 Fed. Reg. 8,237 (Jan. 28, 2025).

[2] "The D.C. Circuit has held that the CAA section 112(d)(6) requirement to periodically review and revise CAA section 112 emission standards "as necessary" is not limited to the consideration of "developments in practices, processes and control technologies." *La. Envtl. Action Network v. EPA*, 955 F.3d 1088, 1097 (2020). Rather, "the operative standard is 'revise as necessary,' with the parenthetical pointing to a non-exhaustive list of considerations." *Id*. The Supreme Court also emphasized in *Michigan* v. *EPA*, 576 U.S. 743, 752 (2015), that unless the statute provides otherwise, broad terms such as "necessary" direct the relevant agency to consider all relevant factors, including by assessing the cost of an action relative to the anticipated benefits. That decision is particularly relevant here because the Court was interpreting a related provision of CAA section 112 that instructs the Administrator to determine whether it is "appropriate and necessary" to regulate HAP emissions from EGUs. Thus, under relevant case law, when the EPA is deciding whether it is "necessary" to revise standards pursuant to CAA section 112(d)(6), the Agency can consider the costs of any developments in practices, processes, and control technologies." 91 Fed. Reg. 9088, 9092 (Feb. 24, 2026) (citations omitted).

rescission. This independently affirms that rescission of that improper rule was proper and necessary. The Administrator of Respondent EPA at the time the 2024 standard was adopted, Michael Regan ("Regan"), announced prior to imposing that revision that a "suite of rules"[3] were forthcoming *to reduce airborne non-GHG emissions* under various authorities regulating solid waste, water, and non-GHG air emissions (*infra*). This was to advance a "climate" policy agenda by making certain forms of energy production cost prohibitive, forcing changes in America's energy mix through premature retirement of certain types of generation so as to reduce greenhouse gas emissions ("GHGs").[4] The Agency sought to compel "expedited retirement" of facilities because its position was that forcing facilities to close prematurely is "the best tool for reducing greenhouse gas emissions."[5] Then-Administrator Regan declared this was intended to make the regulated community

---

[3] Jean Chemnick & Mike Lee, *What the EPA's New Plans for Regulating Power Plants Mean for Carbon*, *Sci. Am.* (Mar. 11, 2022), https://www.scientificamerican.com/article/what-the-epas-new-plans-for-regulating-power-plants-mean-for-carbon/.

[4] "Reducing Emissions and Accelerating Clean Energy: President Biden and Vice President Harris have mobilized a whole-of-government effort in every sector of the economy – taking executive actions that will reduce greenhouse gas emissions, accelerate clean energy production and deployment, and create good-paying jobs that strengthen the economy." *President Biden's Historic Climate Agenda*, White House (archived Dec. 27, 2024), https://web.archive.org/web/20241227073552/https://www.whitehouse.gov/climate/.

[5] Chemnick & Lee, *supra* note 3.

come around to the administration's view of "the future. And that future is clean energy."[6] Meanwhile, after the Supreme Court ruled against generation shifting as an acceptable goal in *West Virginia v. EPA*, 597 U.S. 697 (2022), the EPA modified its claimed objective, dismissing in its administrative record commenters' concerns that the promised result of widespread premature retirements would occur.[7]

Critically, EPA first publicly expressed (but then formally denied in the record) that the MATS rule was an attempt to force "generation shifting," making the underlying rule being rescinded a violation of the relevant Clean Air Act provision; it similarly violates the Major Questions Doctrine, both when standing alone and when properly considered as a part of the "suite of rules" with which the underlying rule was announced as a collective effort to do indirectly what the Supreme Court mere weeks later, in *West Virginia*,[8] affirmed the Agency cannot

---

[6] *EPA Administrator Michael Regan Discusses Supreme Court Ruling on Climate Change*, PBS NewsHour (June 30, 2022), https://www.pbs.org/newshour/show/epa-administrator-michael-regan-discusses-supreme-court-ruling-on-climate-change.

[7] National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38,508, 38,524–27 (May 7, 2024).

[8] 597 U.S. 697 (2022). In *West Virginia*, the Court concluded that Agency regulation to force generation shifting, in that case the Clean Power Plan invoking Section 111(d) (providing authority to set emissions levels for pollutants not covered by the NAAQS or Hazardous Air Pollutant programs), poses a major question and that USEPA pointed to no clear congressional grant of authority to pursue that goal.

through a single rule do directly. That is to implement an administration policy of generation shifting that Congress never empowered the Agency to implement.

Second, this history makes the EPA's administrative record woefully incomplete. By denying its own previously admitted, unlawful rationale of forcing premature retirements, EPA left the underlying rule in violation of the APA as arbitrary and capricious. This is additional grounds for the Agency's rescission now at issue here.

Finally, the described pretext admitted to by the previous administration should doom the underlying rule being rescinded as a violation of the rule against pretext and thereby arbitrary and capricious, further supporting rescission.

This Court should uphold the Rule rescinding the 2024 revisions, or at minimum remand the Rule to a Special Master for discovery into the Agency's state of mind and pretextual reasoning at the time it imposed the 2024 underlying rule, and supplement the record accordingly.

## II. ARGUMENT

### A. The Rescinded Rule was Pretextual and Violated the Doctrine Against Pretext.

1) Respondent's Then-Administrator Regan Confessed the Rescinded Rule, When Issued, Would be Pretextual.

In 2022, Respondent EPA's Administrator Michael Regan ("Regan") boasted that the Agency had a plan to impose a "suite of rules" under various authorities

unrelated to regulating greenhouse gas (GHG) emissions, "to marry a range of EPA authorities"[9] granted by Congress for other purposes but to obtain a result that Regan described as the most efficient means of GHG reduction: forcing plants to close. Among these was a revision to the 2012 MATS standard.

Mr. Regan's announcement came in March 10, 2022 keynote address to CERAWeek, an energy industry conference in Houston. After Regan's prepared remarks, a reporter asked about vulnerabilities of the EPA's approach to climate regulation as manifested in the Clean Power Plan, which was then awaiting judgment by the Supreme Court in *West Virginia v. EPA*. Mr. Regan dismissed the notion that losing in *West Virginia* would derail the Agency because EPA had abandoned the idea of relying on any specific grant of regulatory authority. Instead, EPA planned to tighten rules under numerous and varied regulatory programs and all at once, pressuring disfavored operations to close and compelling investment consistent with the EPA's desires. Regan's response to the questions was reported in, e.g., *Scientific American*, as follows:

---

[9] Michael Regan, Adm'r, U.S. Envtl. Prot. Agency, *Remarks to CERAWeek About EPA's Approach to Deliver Certainty for Power Sector and Ensure Significant Public Health Benefits* (Mar. 11, 2022) (as prepared for delivery) (archived July 9, 2024), https://web.archive.org/web/20240709063814/https://www.epa.gov/speeches/administrator-michael-regan-remarks-ceraweek-about-epas-approach-deliver-certainty-power.

"The industry gets to take a look at this suite of rules all at once and say, 'Is it worth doubling down on investments in this current facility or operation, or should we look at the cost and say no, it's time to pivot and invest in a clean energy future?'" Regan told reporters after his keynote address.

If some of these facilities decide that it's not worth investing in [control technologies] and you get an expedited retirement, that's the best tool for reducing greenhouse gas emissions,' he added.

Asked whether he was concerned that a challenge to EPA's greenhouse gas authority now before the Supreme Court could deal a blow to the agency's climate ambitions, Regan pointed to progress that could be made under other Clean Air Act and Clean Water Act rules.

'I don't believe we have to overly rely on any one regulation,' he said.

EPA can still achieve greenhouse gas reductions using regulations on mercury and other toxic air pollution, soot and other fine particles, and other types of pollution like coal ash and water-based emissions, he said."[10]

According to this reporting, "Regan argued that regulations that would be rolled out in the coming year for mercury, ozone, water and coal ash would help finish the job on curbing climate pollutants that market conditions started by shifting U.S. power generation away from high-emitting coal." That's the point, Regan said, of EPA previewing its regulatory plans in a broad swath instead of staggering their release by statutory deadlines."[11]

---

[10] Chemnick & Lee, *supra* note 3.

[11] *Ibid*.

There is no ambiguity in former Administrator Regan's confession of pretext in the litany of rules EPA issued under the prior administration to force the "expedited retirement" of power plants. Nor was there any ambiguity in the threat that the power-generating industry could either get with Respondents' program or pay the price.

Far from disowning the above as a series of misstatements in followup interviews, EPA posted Administrator Regan's prepared remarks and neither EPA nor Administrator Regan publicly challenged media reports of his comments. Then, less than three months later, on the evening of the day that the Supreme Court issued its opinion in *West Virginia*, Respondent appeared on PBS's *News Hour* to provide the Agency's reaction to the opinion. There Regan reaffirmed the pretext of using a "suite of regulations" across various media, not just air but also even water, in the effort "to regulate climate pollution."

> We still will be able to regulate climate pollution. And we're going to use all of the tools in our toolbox to do so…
>
> And we're going to continue to use every tool we have to keep pace with tackling the climate crisis…
>
> And we're going to continue to use every tool in our toolbox…
>
> **Judy Woodruff:** Well, can you give us a couple of examples of the kinds of tools that you believe you still can use to regulate this industry?
>
> **Michael Regan:** Well, one tool that we will continue to look at is the authority that was in question with the Supreme Court.

Again, that tool is still available. We have just lost some flexibility there. But we also have a suite of regulations that are facing the power sector. And so, as we couple the regulation of climate pollution with the regulation of health-based pollution, we are providing the power sector with a very clear picture of what regulations they're facing, so that they can make the right investment decisions.

And we're hoping that, when they look at the regulation of waste and discharges in water, climate pollution, health-based pollution, they will see that it's not worth investing in the past and they will continue to do what they're doing now, which is invest in the future.

And that future is a clean energy economy.[12]

EPA's public statements are clear about its use of the underlying mercury standard revision(s) and other regulations. EPA never altered its plans after the Supreme Court rejected "what EPA called 'generation shifting' at the grid level—i.e., a shift in electricity production from higher-emitting to lower-emitting producers." *West Virginia v. EPA*, 597 U.S. 697 (2022). The Agency persisted, pretextually seeking to force premature closure of reliable generation in the face of the electricity reliability crisis we are now being warned about by reliability organizations such as the non-profit North American Electric Reliability Corp.,[13]

---

[12] *Regan PBS NewsHour Interview*, *supra* note 6.

[13] Most recently, N. Am. Elec. Reliability Corp., *2025 Long-Term Reliability Assessment* (Jan. 23, 2026), https://www.nerc.com/globalassets/our-work/assessments/nerc_ltra_2025.pdf.

which Federal Energy Regulatory Commission Chair Laura Swett declared at another reliability regulator's May 12, 2026 annual meeting to threaten "potentially historically unprecedented catastrophic [system] failure."[14] It is no coincidence that the threat of a failing electricity grid now stares us in the face after years of this particular policy agenda.[15] This only makes the EPA's 2024 gambit more obviously a violation of the Clean Air Act, both individually and as part of the "suite of rules," and this Court must allow for rescission of unlawfully pretextual rules.

---

[14] Release, "Chairman Laura Swett's Comments at PJM's Annual Meeting in Baltimore, MD," Federal Energy Regulatory Commission, May 12, 2026, https://www.ferc.gov/news-events/news/chairman-laura-swetts-comments-pjms-annual-meeting-baltimore-md-0.

[15] See, e.g., Brad Plumer & Nadja Popovich, *A New Surge in Power Use Is Threatening U.S. Climate Goals*, *N.Y. Times* (Mar. 15, 2024), https://www.nytimes.com/interactive/2024/03/13/climate/electric-power-climate-change.html, which despite the headline describes North American Electric Reliability Corporation (NERC) warnings of declining reliability due largely to premature retirements of coal-fired generation, https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_LTRA_2023.pdf. See, e.g., Ethan Howland, "DOE 'emergency' power plant orders help grid reliability: NERC official," Utility Dive (Feb. 20, 2026), https://www.utilitydive.com/news/doe-emergency-power-plant-orders-grid-reliability-nerc-ferc/812660/. The *Times* story was published one day after the nation's largest power grid (PJM) Independent Market Monitor, warned that it is at risk of losing up to 58,000 MW in power generation by the end of the decade due primarily to the retirement of thermal generators. https://www.monitoringanalytics.com/reports/PJM_State_of_the_Market/2023/2023-som-pjm-vol1.pdf.

2) The Underlying, Rescinded Rule is Pretextual.

So long as one takes then-Administrator Regan at his word, the underlying rule being rescinded is a pretextual attempt to achieve through the back door what the Agency has never lawfully managed to do through the front door, but without proposing a CO2 or GHG NAAQS (in recognition of the substantial legal and political obstacles to doing so including duly enacted law and Supreme Court precedent). EPA does not have the authority to use such regulations as a proxy for greenhouse gas regulations it is unable to find approval for. Clean Air Act authority granted to EPA by Congress to regulate mercury and air toxics was not granted for the purpose being used here. The underlying rule being rescinded impermissibly seeks to use non-GHG regulatory authorities to achieve GHG reductions, specifically by forcing retirement of disfavored facilities by burying them in a "suite of rules" one on top of another and all at once.

The Administrator's confessed purpose was already a scofflaw announcement given the historical prohibition on pretext,[16] and also given *Department of Commerce v. New York,* 588 U.S. 752 (2019), decided just three years prior. By this "suite of rules" to try and do cumulatively through several rules what the Supreme

---

[16] *See generally* Brett W. Hastings, *Taxation Without Limitation: The Prohibited Pretext Doctrine v. the Sebelius Theory*, 15 Marquette Elder's Advisor 229 (2014).

Court had just ruled, about a single rule, the Agency is prohibited from doing, EPA tried "the ultimate work-around" (*infra*) to impose its climate agenda, tightening every screw at hand to force regulated parties to bend to a governmental will it is barred from directly imposing. The underlying rule being rescinded was breathtakingly pretextual and is thereby arbitrary and capricious.

3) The Underlying, Rescinded Rule Violates the Rule Against Pretext.

Pretextually using legal authorities which were provided for one purpose for another purpose altogether violates the rule against pretext, *Department of Commerce v. New York*, and, per at least one subsequent opinion, a violation of the Administrative Procedure Act for being arbitrary and capricious.[17] The district court in *Department of Commerce* followed prior interpretations of the APA's requirement of a reasoned decision-making process and held that there must be disclosure of the actual reasons for the decision made. *See, e.g.*, *New York v. U.S. Dep't of Com.,* 351 F. Supp. 3d 502, 660 (S.D.N.Y. 2019) ("[T]he evidence is clear that Secretary Ross's

---

[17] Although the *Department of Commerce* Court treated pretext as a basis for remand separate from consideration of the Administrative Procedure Act's bar on arbitrary and capricious agency action, at least one other court, *Ctr. for Biological Diversity v. Kempthorne*, No. CV 07-0038-PHX-MHM, 2008 WL 659822, at *11 (D. Ariz. Mar. 6, 2008), has suggested that the APA's prohibition against arbitrary and capricious actions is also implicated. Jack Thorlin, *Can Agencies Lie? A Realist's Guide to Pretext Review*, 80 *Md. L. Rev.* 1021, 1033 (2021).

rationale was pretextual — that is, that the real reason for his decision was something other than the sole reason he put forward in his Memorandum…”).

Although *Department of Commerce v. New York* has been described as the "Dawn of Pretext Review,"[18] the prohibition on pretextual exercise of authority is much older.[19] The pretextual exercise of power runs afoul of basic universal rules applied across government and across the world and grounded—like the major questions doctrine—in the principle of separation of powers. For example:

> "In the judicial process … One of such rules is that if a legislature is prohibited from doing something, it may not do so even under the 'guise or pretence' of doing something that appears to be within its lawful jurisdiction…. This rule may broadly be explained as the observance of 'good faith' in the exercise of legislative powers, and it is implied in the operation of the maxim 'what cannot be done directly cannot be done indirectly.'"[20]

In 1935, the Supreme Court stated, in *United States v. Butler*, 297 U.S. 1 (1935), that it was "an established principle that the attainment of a prohibited end may not be accomplished under the pretext of the exertion of powers which are

---

[18] Thorlin, *supra* note 16, at 1040.

[19] *See, e.g.*, "The Prohibited Pretext Doctrine's foundation was laid out in *McCulloch v. Maryland*…. A century after *McCulloch*, the Supreme Court developed the Prohibited Pretext Doctrine further [i]n *Bailey v. Drexel Furniture Co.*," 259 U.S. 20, 34 (1922). Hastings, *supra* note 15, at 233.

[20] D. K. Singh, "What Cannot Be Done Directly Cannot Be Done Indirectly': Its Meaning and Logical Status in Constitutionalism," 29 Mod. L. Rev. 273 (1966).

granted."[21] In an opinion written by Chief Justice John Roberts and joined by Justices Ginsburg, Breyer, Sotomayor and Kagan, the 5-4 majority in *Department of Commerce* opened the relevant discussion regarding Secretary Wilbur Ross's reinstatement of a citizenship question in the 2020 census by noting, "[f]irst, in order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." 588 U.S. at 780. They concluded that, "[a]ltogether, the evidence tells a story that does not match the explanation the Secretary gave for his decision." *Id*. at 756. Pointing to "a narrow exception to the general rule against inquiring into 'the mental processes of administrative decisionmakers,'" the Supreme Court agreed the matter should be remanded to allow depositions of senior Department officials. *Id*. at 781.[22]

Subsequently, the United States District Court for the District of Rhode Island relied on *Department of Commerce* in holding that an agency action was pretextual

---

[21] *United States v. Butler*, 297 U.S. at 68.

[22] In *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971), the Supreme Court noted that where "the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence," *id.* at 420, "[t]he court may require the administrative officials who participated in the decision to give testimony explaining their action, *id.*, noting that affidavits are often "merely 'post hoc' rationalizations … [which] cannot serve as a sufficient predicate for agency action," *Id*. at 419. Here, it is the administrative record that is the post hoc rationalization, after the EPA was forced to retcon its clumsy public confession of purpose with *West Virginia v. EPA*.

and therefore arbitrary and capricious, citing in part to public statements by agency officials including statements on the agency's website. *R.I. State Council of Churches v. Rollins*, 808 F. Supp. 3d 370, 385 (D.R.I. 2025) ("This Court is not naïve to the administration's true motivations.").

"The Constitution deals with substance, not shadows." *Cummings v. Missouri*, 71 U.S. 277 (1867). But substituting shadows for substance is exactly what Respondent EPA did in promulgating the underlying 2024 rule being rescinded by the Rule at issue here, led by then-Administrator Regan who boasted of its pretextual nature with historically inelegant timing. This occurred mere weeks before *West Virginia* prompted denial of this in the administrative record, and the "law whispering" Assistant Administrator for Air and Radiation who oversaw the effort[23].

Both the majority opinion in *West Virginia* and Justice Gorsuch's concurrence took pains to undermine the increasing use of such pen-and-phone regulations as substitutes for laws passed by the people's representatives, referencing other such candid outbursts about end-run rulemaking in which the Court has found support for reversing other executive overreach. *West Virginia*, 597 U.S. at 745 ("if Congress

---

[23] Then-Assistant Administrator Joseph Goffman is called "'EPA's Law Whisperer' because 'his specialty is teaching old laws to do new tricks.'" *Joseph Goffman Joins Environmental Law Program as New Executive Director*, Harv. L. Today (Oct. 2, 2017), https://today.law.harvard.edu/joseph-goffman-joins-environmental-law-program-new-executive-director/.

won't act soon . . . I will,"); *id*. at 746 ("that an agency is attempting to '"work [a]round"' the legislative process to resolve for itself a question of great political significance."). To this pantheon of euphemisms for Executive Branch impropriety, "law whispering" should now be added.

From this series of rejections of pen-and-phone governance cited by Justice Gorsuch, some lawyers involved in the climate-regulation industry took the lesson that bragging about clever regulatory approaches would also come back to haunt the campaign then underway to use the Clean Air Act to achieve GHG reductions. Two weeks after *West Virginia v. EPA* was issued, the Environmental Law Institute hosted a webinar[24] in which panelists urged activists to be careful in their press releases and that "we don't want the political appointees to get out in front of the lawyers." That July 2022 counsel came too late, with the then-Administrator having already burdened the "suite of rules" with his March announcement of the strategy to attain reductions by forcing facility retirements by "marry[ing] a range of EPA authorities" granted to the Agency by Congress for other purposes.

The presumption of regularity granted to executive agencies is surmountable when there is evidence of pretextual rulemaking or otherwise bad faith. In the instant

---

[24] Env't L. Inst., *West Virginia v. EPA: Analyzing Supreme Court's Decision*, https://www.eli.org/events/west-virginia-v-epa-analyzing-supreme-courts-decision (last visited May 11, 2026).

matter, the pretext is undeniable, having been boastfully announced and, as one author notes about the pretext doctrine, "what is pretext if not a form of "'bad faith'?"[25] Thanks to former Administrator Regan's candor, each of the 2024 "suite of rules" offers a clear case.

Precedent allows for other methods of discerning a regulator's state-of-mind, where substantial questions about pretext exist. Litigation affidavits fail to present contemporaneous records of agency intent but are often little more than "post facto justifications."[26] Alternately, this Court can simply take former Administrator Regan at his word, the candor of which makes the Supreme Court's conclusion in the census case worth quoting at length here:

> "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise. If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case… We do not hold that the agency decision here was substantively invalid. But agencies must pursue their goals reasonably. Reasoned decisionmaking under the Administrative Procedure Act [APA] calls for an explanation for agency action. What was provided here was more of a distraction."

---

[25] Thorlin, *supra* note 16, at 1031.

[26] *See, e.g.*, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 420. "Such an explanation will, to some extent, be a "post hoc rationalization," and thus must be viewed critically."

*Department of Commerce*, 588 U.S. at 756.

To believe the Administrator's own words, or not to believe—that is the question. GAO respectfully suggests this Court should believe former Administrator Regan and conclude that the EPA did in its underlying 2024 rule (rescinded by the Rule at issue here), what the Supreme Court struck down in *West Virginia*. The 'backdoor,' or proxy use of regulations to achieve GHG emission reductions and thereby force "generation shifting" is impermissible, whether viewing the 2024 rule in isolation or, as then-Administrator Regan's comments demand, as part of the intentional "suite of rules" to force the regulated community to come around to the administration's desires on "invest[ing] in the future."

Because the public record clearly reflects the Agency admitting to pretextual rulemaking, the object of which pretext being inarguably unconstitutional pursuant to *West Virginia v. EPA*, this Court should allow the Rule rescinding the 2024 revision. Alternately, the Court should order discovery to discern Mrs. Regan's true purpose in promulgating the 2024 rule, consistent with *Department of Commerce*.

**B. The Rule Violates the Major Questions Doctrine**

The 2024 revision rescinded by the Rule at issue here sought to determine how Americans get their energy. That's a burden of "economic and political significance," which violates the Constitution given that, absent "clear congressional

authorization." *West Virginia*, 597 U.S. at 700. This is outside the Respondents' authority.[27] *West Virginia* addressed power the Agency claimed under a specific rule, whether generation shifting can be a "system of emission reduction" under CAA Section 111. However, the Court's analysis is not confined to that discrete issue. The majority wrote:

> There is little reason to think Congress assigned such decisions to the Agency. … "When [an] agency has no comparative expertise" in making certain policy judgments, we have said, "Congress presumably would not" task it with doing so…
>
> We also find it "highly unlikely that Congress would leave" to "agency discretion" the decision of how much coal- based generation there should be over the coming decades.

The 2024 revision violates the Major Questions Doctrine, standing alone. Yet the Supreme Court has not limited the "major questions doctrine" to a discrete agency action. Reading the recent string of major-question rulings striking down administration overreach cited in *West Virginia*, this seems particularly apparent in the case of an agency itself repeatedly confessing that it seeks to do through a "suite of rules" what no court has confirmed the Agency may do through any particular

---

[27] *West Virginia*, 597 U.S. at 732–33 ("[a]nd this Court doubts that Congress. . . intended to delegate . . . decision[s] of such economic and political significance," i.e., how much coal-based generation there should be over the coming decades, to any administrative agency.") (cleaned up).

rule. To do so would fly in the face of the Court's position as articulated in *Cummings v. Missouri*, that "[w]hat cannot be done directly cannot be done indirectly." 71 U.S. at 277.

The totality of the record reveals that the 2024 standard fails Major Questions analysis both individually and as part of a "suite of rules" each and all of which are burdened by Administrator Regan's insistence of the intended cumulative effects with other regulations. It was presented as part of a cumulative effort and therefore is rightly also considered in the same light. The federal courts have considered cumulative effects under both immigration law, *Salguero Sosa v. Garland*, 77 F.4th 1246, 1246 (9th Cir. 2023), and under NEPA. See *Killgore v. SpecPro Pro. Servs., LLC*, 51 F.4th 973, 989 (9th Cir. 2022) (cumulative impacts analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects.").

The same principles should also be used in this case to allow the Rule rescinding the unlawful 2024 standard. The latter is properly viewed as part of the Agency's serially declared "suite of rules," a sweeping, cumulatively imposed regulatory burden with a stated objective that the Agency has yet to persuade a court it has the authority to pursue. It is properly rescinded by the Rule at issue here, which should be allowed.

### III. The Rule Rescinding the Unlawful Underlying Rule Should Stand

This Court has held that "Agency action is arbitrary or capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Guedes v. BATFE*, 920 F.3d 1, 32 (2019), quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Taking former Administrator Regan at his word, the Agency proceeded pretextually, already a brazen move to announce particularly post-*Department of Commerce v. New York*, but toward an objective that was soon affirmed as untenable by *West Virginia v. EPA*. The administrative record does not reflect this true purpose, and omitting these truths from the record should similarly doom the 2024 rule to rescission.

In *West Virginia v. EPA*, the United States Supreme Court added its clearest statement to that point in time to the admonition against agencies purporting to find elephants in legislative mouseholes and claim authority never specifically granted them by Congress. 597 U.S. at 746. The underlying rule ignored that, while also implicating another, even more basic standard, the doctrine against the pretextual exercise of authority as articulated in *Department of Commerce v. New York*. The

2024 standard rescinded by the Rule at issue here offends both precedents, and the rescission should be allowed.

This Court must prevent sanctioning such an end-run around current law and sound policy, leaving it to legislative enactments to provide the authority Respondent claimed but now properly seeks to disavow.

## IV.    CONCLUSION

For these reasons stated above, GAO wishes to provide this Court with the extensive documentary trail supporting the argument that the underlying rule being rescinded by the Rule at issue here was designed to pretextually obtain what could not otherwise be obtained through the ordinary political and regulatory processes. Accordingly, GAO suggests that this Court should consider and take judicial notice of the information cited herein. Further, GAO suggests that the Court must necessarily allow the Rule rescinding the unlawful standard, after considering the improper purpose for imposing it which is part of the public record. At minimum, a Special Master is warranted to oversee discovery into the Agency's state of mind or, in short, which of its tales is the truth.

Respectfully submitted this the 14th day of May, 2026,

/s/ Matthew D. Hardin
Matthew D. Hardin
D.C. Bar No. 1032711
1725 I Street NW, Suite 300

Washington, DC 20006
(202) 802-1948
Matt@MatthewHardin.com

/s/ Christopher C. Horner
Christopher C. Horner
D.C. Bar No. 440107
1725 I Street NW, Suite 300
Washington, DC 20006
(202) 262-4458
Chris@chornerlaw.com

*Counsel for Amicus Curiae*

24

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Counsel hereby certifies, in accordance with Federal Rule of Appellate Procedure 32(g)(1), that the following brief contains 5,510 words, as counted by counsel's word processing system, and thus complies with the 6,500-word limit. Fed. R. App. P. 29(a)(5). Further, this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 using size 14 Times New Roman font.

Dated: May 14, 2026

/s/ Matthew D. Hardin
Matthew D. Hardin